

NUMBER 13-11-00050-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**GENIE INDUSTRIES, INC.,**                                                          **Appellant,**

**v.**

**RICKY MATAK, BELINDA MATAK, AND
MISTY SONNIER AS REPRESENTATIVE
OF THE ESTATE OF WALTER PETE LOGAN
MATAK, DECEASED,**                                                          **Appellees.**

---

### On appeal from the 60th District Court
### of Jefferson County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion by Justice Benavides

In this products liability action, appellant Genie Industries, Inc. ("Genie") appeals

an adverse jury verdict. By three issues, Genie asserts that: (1) the evidence is

legally insufficient to establish that the product in controversy possessed a design defect;

(2) the trial court erred by granting two of the appellees' *Batson/Edmonson* challenges; and (3) the trial court failed to give Genie a full settlement credit on final judgment. We affirm, in part, and reverse and remand, in part.

## I. BACKGROUND[1]

On March 30, 2009, 24-year-old Walter Pete Logan Matak ("Logan") died at a Beaumont hospital from massive craniocerebral injuries less than two hours after he crash-landed to the floor from a 40-foot, fully-extended, AWP-40S single-bucket aerial work platform (AWP-40S or "the lift") manufactured by Genie.[2] Logan, who was an apprentice electrician at Gulf Coast Electric Company, used the lift to complete some high-ceiling electrical work at the Cathedral in the Pines church in Beaumont. The church owned the lift and granted permission to Logan and his supervisor, James Boggan, to use it in order to complete their work inside the church.

Logan ran fiber optic cable that morning at various high points in the church's sanctuary. Prior to the fall, Boggan testified that each time Logan needed to reposition himself to work, Logan would lower the lift, exit the lift bucket, and he and Logan would remove the lift's outriggers to move the lift to a new spot. Boggan testified that at some point that morning, the Cathedral's maintenance worker, John Adams, suggested that Logan did not need to lower and exit the basket each time he needed to reposition himself, but rather, they could raise the outriggers and roll the lift while Logan was

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

[2] The AWP-40S was described as a portable and lightweight single-person aerial lift. The work platform, or bucket, is enclosed with a guardrail and telescopes up to forty feet. The mast is made of aluminum. The base is supported by four outriggers at each corner, with foot pads supporting each outrigger. According to Genie, the outriggers must be locked in place in order for the machine to extend. The lift's base has wheels which allow a single person to roll it around a particular worksite.

elevated. Adams told the pair that he moved the lift in that manner "all the time." Boggan testified that he had used similar aerial lifts in other jobs, but that he had never attempted to move a machine while the bucket was elevated and in use.

There is conflicting testimony regarding the events that followed. According to Boggan, he and Adams attempted to move an elevated Logan only once, which caused the lift to tip over. Boggan testified that he was the only person who lifted the stabilizers off the ground to remove the pressure on the footpads, and that Adams then helped him move the lift. Adams, however, testified that they each raised two outriggers and had moved Logan, without incident, several times before the machine tipped over. Both witnesses testified that the outriggers were raised a matter of inches, just enough to clear the carpet and allow the lift to roll. According to both witnesses, Logan remarked that he and the lift were "leaning" immediately before the crash landing on the sanctuary floor.

The Matak family (appellees) filed suit shortly after Logan's death and named Genie, Gulf Coast Electric, and Cathedral in the Pines as defendants. Gulf Coast Electric and Cathedral in the Pines settled prior to trial. Trial moved forward against Genie with the appellees asserting causes of action under several theories of liability: (1) strict products liability for a defective design; (2) negligence; and (3) breach of warranty. At trial, a Jefferson County jury found that the Genie AWP-40S possessed a design defect and that the defect was the producing cause of the injuries alleged by the Matak family. The jury allocated responsibility as follows:

Genie Industries          <u>55%</u>

Cathedral in the Pines        20%

Gulf Coast Electric Co.        20%

Logan Matak                     5%

The jury found total damages sustained by the appellees at $1,305,701.70.    This

appeal followed.

## II.    DESIGN DEFECT

In its first issue, Genie asserts that the evidence was legally insufficient to

establish that the AWP-40S was defectively designed, and this court should accordingly

reverse and render judgment in its favor.

## A.    Applicable Law and Standard of Review

To prevail in a products liability claim alleging a design defect, a plaintiff must

prove by a preponderance of the evidence that: (1) the product was defectively designed

so as to be unreasonably dangerous; (2) a safer alternative design existed[3]; and (3) the

defect was the producing cause of the damages sought.    *See* TEX. CIV. PRAC. & REM.

CODE ANN. § 82.005(a) (West 2011); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306,

311–12 (Tex. 2009); *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 255–57 (Tex. 1999).

Texas courts have applied a risk-utility analysis to determine whether a

defectively designed product is unreasonably dangerous.    *See Timpte Indus.*, 286

S.W.3d at 311 (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997)).

These factors include:

---

[3] A "safer alternative design" is statutorily defined as a product design other than the one actually used that in reasonable probability:  (1) would have prevented or significantly reduced the risk of the plaintiff's injuries; (2) without substantially impairing the product's utility; and (3) was economically and technologically feasible when the product was manufactured or sold.   TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b) (West 2011); *see Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 258 (Tex. 1999).

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use;

(2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;

(3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;

(4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and

(5) the expectations of the ordinary consumer.

*Grinnell*, 951 S.W.2d at 432.

Whether a product is unreasonably dangerous is generally a question of fact for the jury. *Id.* (citing *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979)); *see also Hernandez*, 2 S.W.3d at 260 ("The determination of whether a product is unreasonably dangerous because of a defective design is often one that involves factual disputes that a party is entitled to have a jury resolve."). However, when reasonable minds cannot differ on the risk-utility analysis considerations, the issue of whether a product is unreasonably dangerous may be determined as a matter of law. *See Timpte*, 286 S.W.3d at 312 (citing *Hernandez*, 2 S.W.3d at 260). Texas has also rejected a bright-line "open and obvious danger rule," with the Texas Supreme Court holding that "a design defect may attach even if the defect is apparent." *Timpte*, 286 S.W.3d at 312 (quoting *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383–84 (Tex. 1995)).

We will sustain a legal sufficiency challenge when the record discloses the following situations: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to

prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 1995).

**B.      Discussion**

**1.      *Risk-Utility Analysis***

First, we must employ the risk-utility analysis set forth in *Grinnell* to determine whether legally sufficient evidence supported a finding that the Genie lift was defectively designed so as to be unreasonably dangerous.   *See* 951 S.W.2d at 432.   The risk-utility analysis "does not operate in a vacuum, but rather in the context of the product's intended use and its intended users." *Timpte*, 286 S.W.3d at 312.   In light of our complete review of the evidence, we find evidence sufficient to support the jury's conclusion that the AWP-40S was unreasonably dangerous because numerous disputed facts were presented for the jury to consider.   *See Hernandez*, 2 S.W.3d at 260.

The appellees alleged that the Genie lift was defectively designed because the design did not account for foreseeable misuses of the product—more specifically, that the lift's outriggers would be removed and the base would be moved while someone was elevated inside the lift's basket.   Genie contended at trial that the utility of the AWP-40S lift is to provide users with a convenient, lightweight, and compactly-designed lift to access hard-to-reach heights.   Specifically, Genie's corporate representative and director of product safety, Rick Curtin, emphasized at trial that this particular lift was portable, unlike other models.   Curtin testified that the lift's portability was "very important," and was "the key thing that makes the machine useful."   Curtin gave an example that a single person could "roll the machine around on a work site," and later

6

"position [the lift] where they [were] going to . . . work with it." Curtin noted in his testimony that the lift's outriggers allow for the user to stabilize the machine when variances exist on the floor. The evidence shows that a consumer would expect the AWP-40S to be a lightweight, mobile, and portable lift to work on high, hard-to-reach spots.

On cross-examination, Curtin admitted that Genie knew of the potential hazard caused by moving the lift while the basket was in the air. Curtin testified:

> I know that I've always had knowledge that the machine has to be stabilized properly and if not stabilized properly, then it can tip over. And, so, that's been in mind ever since I started working with the company.

Appellees emphasized at trial—and again on appeal—that Genie was aware of the lift's potential to tip over and cause injury, at any height, if moved while the bucket was in the air but did nothing to "design out" the defect, despite cost-effective fixes or alternatives to prevent it. Genie counters by arguing that the hazard was warned against through a warning label, but the utility of the lift outweighed the risk of the lift tipping over and causing serious injury when it is assumed that the product will be used as intended (i.e. when properly stabilized).

Genie conceded, however, that Logan's use of the AWP-40S was a "foreseeable misuse" of the product. The fact that the lift's utility is high and the risk of injury is low when the product is used as intended is but one consideration in the multitude of factors used in *Grinnell*'s risk-utility analysis. The fact that a product's foreseeable risk of harm stems from a misuse of a product, rather than an intended use, is not an absolute bar to liability for the injury caused by a product's defective design. *Hernandez*, 2 S.W.3d at 257; *see Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 594 (Tex. 1999) (holding that

7

a consumer's "duty to discover defects, and to take precautions in constant anticipation that a product might have a defect, would defeat the purposes of strict liability"). "Instead, misuse of a product is a factor that must be considered in allocating responsibility for the injury." *Hernandez*, 2 S.W.3d at 257. While consumers and end users may not have a duty to discover or guard against a product's defect, a consumer's conduct—other than a failure to discover or guard against the product defect—is subject to comparative responsibility. *See Sanchez*, 997 S.W.2d at 594 (holding that public policy favors reasonable conduct by consumers regardless of whether a product is defective, and does not relieve a consumer of the responsibility to act reasonably); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (West 2008).

Here, the appellees argued that the evidence shows that Logan's foreseeable misuse of the lift was established not only by Adams's suggestion to move the lift while in use because he did it "all the time," but also by Logan and Boggan's acknowledgment of the misuse. Appellees argued, however, that Genie also played a role in the foreseeable misuse and eventual injury to Logan for not designing against it. Genie's admission to the foreseeability of misuses combined with Logan, Boggan, and Adams's conduct are disputed factors that the jury was within its purview to consider and weigh when conducting its risk-utility assessment. *Hernandez*, 2 S.W.3d at 257.

Curtin testified that he was not aware, nor could he recall, either as corporate representative or director of product safety for Genie, that the company ever thought about, discussed, or attempted to develop an alternative design or guard to prevent the known tip-over risk if the outriggers were removed. When asked by appellees' counsel about what Genie had done to eliminate the unsafe character of the product without

8

seriously impairing its usefulness or significantly increasing its costs, Curtin testified that Genie offered training to operators of the lifts and placed warning stickers on the machines. Additionally, Curtin testified that Genie designed the AWP-40S to elevate only if the outriggers were in place and in contact with the ground. Appellees' counsel acknowledged that safety feature, but asked what was in place to prevent the lift from being moved while the bucket was elevated. The following exchange took place:

| | |
|---|---|
| [APPELLEES' COUNSEL]: | So, I agree with you, you've got something in place that won't let you go up if the outriggers are not in place. But if I'm up, what do you have and what have you done to design out somebody pushing the machine while somebody's up in the air? |
| [CURTIN]: | I don't believe that there's any way to design out having somebody misuse the machine by taking the outriggers out. What we have done is we have provided what we can provide, which is warnings and instructions for the proper use of the machine. We also provided training that we were talking about. And all of that is part of the design. It's considered as you're doing the design. It's not separate from it. |

Genie argued at trial, and now on appeal, that the lift is a safer alternative than an industrial ladder which can extend to forty feet because the lift ascends and descends quickly, which reduces operator fatigue, and the lift's base has guard rails to prevent falls. Appellees' expert, however, presented four alternative designs which purportedly cost in the range of $25 to $200,[4] and would have reduced the magnitude and likelihood

---

[4] Cathedral in the Pines pastor, Louis R. Feldschau, testified that the church paid approximately $10,000.00 for the AWP-40S lift.

9

of the injury in this case, but still retain the utility of the lift.[5]   Genie countered, however, that appellees' proposed alternative designs would have reduced the utility of the lift, increased the danger of a fall, or would not have prevented Logan's accident.

Under the *Grinnell* factors, the evidence shows numerous facts, which rise to more than a mere scintilla, indicating that the AWP-40S was an unreasonably dangerous design.   These conflicts and disputes were the type for which reasonable minds could disagree, and thus, cannot be decided as a matter of law.   *See Timpte Indus.*, 286 S.W.3d at 311.

**2.   *Safer Alternative Design***

Genie argues next that the appellees failed to offer legally sufficient evidence of a safer alternative design because the offered designs fail to: (1) prevent or significantly reduce the risk of injury without substantially impairing the product's utility; and (2) be economically and technologically feasible.   *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b)(1)–(2).   We disagree.

**a.  Automatic Drop Down Design**

The appellee's first proposed safer alternative design involves an automatic drop-down design, developed by appellee's expert Ken Zimmer.   Zimmer testified that under this alternative design, the aerial bucket would lower at a rate of one-foot per second when pressure was lifted from one of the outriggers' foot pads following a two-second warning alarm.   Zimmer estimated through his own testing of the AWP-40S that it would take approximately ten to twelve-and-a-half seconds to remove one

---

[5] Because the Texas Legislature elevated the availability of a safer alternative design from a *factor* to be considered in a risk-utility analysis to a requisite *element* of a cause of action for a defectively designed product, we will examine whether a safer alternative design existed in more detail in PART II (B)(2) of this opinion.   *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a)(1); *Hernandez,* 2 S.W.3d at 256–57.

10

outrigger.    Genie challenged this contention by arguing that tip-over posed a safety risk at any height.    Zimmer estimated that at thirty seconds, after three pads were removed and with the automatic drop-down design in place, Logan would have been "very close to the platform height" where the tip-over risk is low.    Zimmer opined that the utility of the lift would not be affected by this alternative design, and if anything, the design would add to its safety and would have significantly reduced the risk of Logan's injury in this case. Zimmer testified that the added safety feature would increase the utility of the lift because "these machines get into the hands of untrained people."

Zimmer testified that this alternative design would entail retooling the circuit board of the lift to add another switch and cause the lift's platform to lower when the outriggers are lifted and the bucket is elevated.    Zimmer stated that "[i]t's kind of like taking a circuit and turning it upside down because it's already there right side up."    The estimated cost of such a switch was $25, which established the alternative design's economic feasibility on a $10,000.00 machine.    *See Honda of Am. Mfg., Inc. v. Norman*, 104 S.W.3d 600, 607 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("To establish economic feasibility, the plaintiff must introduce proof of the 'cost of incorporating this technology'").

A range of evidence was also offered to support that this alternative design was technologically feasible.    Genie argues that Zimmer admitted that his design was a hypothetical proposal which had not been incorporated in Zimmer's practice as a design engineer, and should be disregarded as a matter of law.    We disagree.    A plaintiff needs only to prove that the alternative design is "capable of being developed . . . even though the [plaintiff's] expert has produced no prototype."    *Sanchez*, 997 S.W.2d at 592 (Tex. 1999) (citing *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 748 (Tex.

11

1980)).   Here, evidence was presented that Genie has products which already incorporate the automatic drop technology.   Further, Curtin admitted that hypothetically, a company "may be able to design a system that would allow the platform to come down," but testified that Genie would never do it because of unspecified safety concerns.

### b. Pothole Protection Design

The appellees' expert proposed a second alternative design known as the "pothole protection" design.   The general idea behind this design involved the mechanical deployment of outriggers as the lift's basket is raised.   A live demonstration of this technology, narrated by Zimmer, was presented to the jury, but was not provided to this Court for review.   According to Zimmer, the outriggers extend and stabilize as the lift rises, unlike on the AWP-40S.   Thus, the outriggers could not be removed while the basket was deployed.   Zimmer testified that the utility of the pothole protection design would have reduced the risk of injury when compared to the AWP-40S because the outriggers could not be removed while the lift was elevated.   Genie contended that this pothole protection design was designed for a mobile lift, whereas the AWP-40S is a stationary lift, governed by different safety standards.   Zimmer countered, however, that his alternative lift design, while mobile, was still moved from location to location by manual force, much like the AWP-40S.   This particular design's technology is in place in other lifts and has been implemented since the 1980s.   Zimmer estimated that this modified outrigger system would cost about $200.00 and was economically feasible.

### c. Chain and Padlock Design

Zimmer offered a third design known as the "chain and padlock" or "lock-out/tag-out" design. Generally, this design would lock the outrigger in place with a padlock, and the person in the bucket would have the only key to unlock it. Therefore, while the lift bucket/basket is elevated, the outrigger remains in place if someone on the ground attempted to remove it, as occurred in this case. Zimmer testified that padlocks and chains are technologically feasible and would cost approximately $25 to implement and would have virtually eliminated Logan's tip-over risk because the outriggers would never have been raised without his knowledge. Genie argues that this design is legally insufficient to support the reasonably safer alternative design element because Logan, Boggan, and Adams made a conscious decision to ignore the current warnings on the AWP-40S and would have moved the lift while it was elevated anyway.

### d. Block Idea

Finally, the appellees developed a lay "block theory" alternative design when they questioned Genie's expert.[6] Under this design theory, the AWP-40S would have a block on one end, and a wheel on the other much like an air compressor one would have at home. The wheel would aid in keeping the portability and "tilt back" feature in place, but the block would prevent the AWP-40S from being moved if the outriggers were removed while the lift's bucket was in the air. Curtin admitted that the theory would be technologically and economically feasible, but testified that the lift's utility would suffer because it would be more time consuming to move the lift. The appellees challenged

---

[6] This lay theory was presented to and discussed with Genie's expert and corporate representative Rick Curtin. Genie did not object to this lay theory at any point before or during its introduction to the jury. Instead, Genie's first objection to this lay theory came a day after the theory's introduction. Accordingly, any challenges to the admissibility of this testimony on appeal are waived. *See* TEX. R. APP. P. 33.1.

13

Curtin that the actual time difference in moving the AWP-40S involved adding a couple more steps under the block design versus the present design and would thus not substantially impair the lift's utility.

All four alternative design theories in this case constituted more than a mere scintilla of evidence upon which the jury could have determined that a safer alternative design existed.

### 3.    *Conclusion*

Because the evidence was legally sufficient for a reasonable jury to have concluded that the AWP-40S was defectively designed, we overrule Genie's first issue.

### III.    *BATSON/EDMONSON* CHALLENGES

In its second issue, Genie contends that the trial court erred in its *Batson/Edmonson* rulings regarding two jurors.

### A.    Applicable Law and Standard of Review

In a civil trial, exclusion from the venire on account of race violates a prospective juror's equal protection rights; and an opposing litigant may raise the excluded person's rights on his or her behalf. *Edmonson v. Leesville Concrete Co., Inc.* 500 U.S. 614, 628–31 (1991) (extending the holding in *Batson v. Kentucky*, 476 U.S. 79, 85–99 (1986) to civil proceedings); *see Powers v. Palacios*, 813 S.W.2d 489, 490 (Tex. 1991) (per curiam) (extending the *Edmonson* holding to Texas cases).

A three-step process—guided by substantive parameters set forth by the United States Supreme Court—controls the resolution of a *Batson/Edmonson* objection.   *See Goode v. Shoufeh*, 943 S.W.2d 441, 445 (Tex. 1997) (internal citations omitted).   First, the opponent of the peremptory challenge must establish a prima facie case of

14

purposeful discrimination; second, the burden shifts to the party who exercised the strike to come forward with a race-neutral explanation; and third, the trial court must determine if the party challenging the strike has proven purposeful racial discrimination. The trial court may choose to believe, or not believe, the explanation offered by the party who exercised the peremptory challenge. *See id.*

We review a trial court's ruling on a *Batson/Edmonson* objection in civil cases for an abuse of discretion. *Id.* at 446. A trial court abuses its discretion if its decision is "arbitrary, unreasonable, and without reference to guiding principles." *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996).

## B. Discussion

After voir dire, Genie peremptorily struck six black veniremembers. Initially, the appellees challenged all of Genie's strikes on *Batson/Edmonson* grounds, but the trial court sustained their objections only to jurors Gwendolyn Sharp and Charline G. Lawrence. Because the trial court sustained the *Batson/Edmonson* challenges on jurors Sharp and Lawrence, after Genie offered race-neutral explanations for striking them, the preliminary issue of making a prima facie case of discriminatory intent is moot. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991); *Goode*, 943 S.W.2d at 445. Accordingly, we will analyze the remaining two prongs under *Batson/Edmonson*.

Genie argues that race-neutral grounds supported its peremptory strikes of jurors Sharp and Lawrence. With regard to Sharp, Genie argues that Sharp and the Matak family's trial counsel, James Payne, were acquainted through church circles. The record indicates, however, that when Genie's counsel asked Juror Sharp on two occasions whether her acquaintanceship with Payne would have any effect on her ability

to serve as a juror, both times Sharp answered, "no." Genie argues further that it was concerned with Sharp's marriage to a church pastor because "she might be reluctant to hold a church liable." Again, when asked by Genie's counsel whether she would have any problem holding a church liable for negligence, Sharp answered, "no."

Next, Genie argues that it struck Lawrence due to her "positive responses and reactions" to the appellees' trial counsel during voir dire. Lawrence appeared to speak during voir dire only once, when she agreed with a statement made by a white juror, James D. Marrs, whose statement supported Genie's position. Genie struck Lawrence, but did not strike Marrs.

The trial court evaluated Genie's race-neutral arguments with regard to all six challenges, and found two arguments implausible. All six of Genie's strikes were used to exclude black prospective jurors. Eleven of the twenty-seven prospective jurors were black—roughly, forty-one percent of the panel. Of that estimated forty-one percent (41%), approximately fifty-five percent (55%) of the total black veniremembers were peremptorily struck and excluded by Genie. This statistical disparity was pointed out to the trial court and within the trial court's discretion to consider in its ruling. *See Miller-El v. Dretke*, 545 U.S. 231, 240–41 (2005); *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 516 (Tex. 2008) (noting that the statistical disparity in that case was unlikely produced by "happenstance").

Furthermore, the appellees argue for a comparative juror analysis. First, one of Genie's race-neutral arguments—i.e. that juror Sharp's affiliation with a church may affect her willingness to hold a church liable—was undermined when Genie did not strike white juror Emma R. Melanson, a former employee of the Cathedral in the Pines.

16

Second, as pointed out previously in this section, juror Lawrence's sole response during voir dire was that she agreed with juror Marrs's statement which appeared to support Genie's position. While Genie did not strike Marrs, who is white, it did strike Lawrence. Finally, Genie argues that Lawrence's positive demeanor toward appellees' trial counsel was another reason to strike her. However, "nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike." *Davis*, 268 S.W.3d at 518. The record shows nothing to suggest that Lawrence was hostile to Genie's case; to the contrary, the record supports an opposite inference. *See Hill v. State*, 827 S.W.2d 860, 871 (Tex. Crim. App. 1992) (en banc).[7]

Accordingly, we conclude that the trial court did not abuse its discretion in sustaining two *Batson/Edmonson* challenges. Genie's second issue is overruled.

## IV. SETTLEMENT CREDIT

In its final issue, Genie argues that the trial court erred when it entered judgment without giving Genie full credit for the appellees' pretrial settlement with Cathedral in the Pines church.

## A. Applicable Law and Standard of Review

Chapter 33 of the Texas Civil Practice and Remedies Code along with the common-law guides the analysis of this issue. Chapter 33 applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(a)(1) (West 2008). Furthermore, section 33.012 requires the trial court to reduce the amount of recovery if the claimant has settled with

---

[7] The Texas Supreme Court noted that *Batson* procedure is "much more developed" in Texas criminal jurisprudence. *Goode v. Shoukfeh*, 943 S.W.2d 441, 450 (Tex. 1997).

17

one or more persons with respect to the cause of action by the sum of the dollar amounts of all settlements. *Id.* § 33.012(b); *see First Title Co. v. Garrett*, 860 S.W.2d 74, 78 (Tex. 1993) (holding that "when a plaintiff files suit alleging that multiple tortfeasors are responsible for the plaintiff's injury, any settlements are to be credited against the amount for which the liable parties as a whole are found responsible, but for which only the non-settling defendant remains in court") The rationale for this doctrine is that the plaintiff should not receive a windfall by recovering an amount in court that covers the plaintiff's entire damages, but to which a settling defendant has already partially contributed. The plaintiff would otherwise be recovering an amount greater than the trier of fact has determined would fully compensate for the injury. *Id.*

In order to determine the sum of the dollar amounts of all settlements, the Texas Supreme Court instructs us to turn to the common law. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998). Under the common law, a defendant seeking a settlement credit has the burden of proving its right to such a credit. *Id.* (citing *First Title Co.* 860 S.W.2d at 78). This burden can be met by placing the settlement agreement or some evidence of the settlement amount in the record. *Ellender*, 968 S.W.2d at 927. Once the defendant meets its burden, the burden then shifts to the settling party, who must tender a valid settlement agreement allocating between actual and punitive damages to the trial court before judgment is entered. *Id.* at 928. If the settlement agreement is not tendered, or allocation between actual and punitive damages is not proven to the trial court before judgment, the non-settling defendant is entitled to a credit equaling the entire settlement amount. *Id.* A plaintiff is limited to

18

proving allocation of damages to that which is expressly stated in a valid settlement agreement. *Id.*

We review a trial court's determination of the existence of, or the amount of, or its decision to apply a settlement credit for an abuse of discretion. *See Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 326 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *Tex. Capital Sec. Inc. v. Sandefer*, 108 S.W.3d 923, 925 (Tex. App.—Texarkana 2003, pet. denied).

**B.    Discussion**

Genie met its initial burden to show that it was entitled to a credit for Cathedral in the Pines' confidential pretrial settlement.[8]    The amount was placed into the record on two separate occasions—the first, in open court by the appellees' trial counsel at a pretrial hearing; and the second by an in-camera admission of the written settlement agreement at a post-verdict hearing to enter judgment.    Therefore, the burden then shifted to the appellees to prove the allocation of actual versus exemplary damages from its settlement agreement with Cathedral in the Pines.    Genie argues that the entire settlement amount was for actual damages, rather than divided between actual and exemplary damages, as argued by the appellees to the trial court and on appeal. Based upon the terms of the written settlement agreement included in the record, we agree with Genie.

The appellees put forth an intriguing, yet unpersuasive, argument that the confidential settlement amount with the church includes actual and exemplary damages

---

[8] We note that co-defendant Gulf Coast Electric Company purportedly settled with the appellees at the pretrial stage exclusively on a claim of gross negligence against Gulf Coast Electric Company.    This settlement is not before us on appeal.

19

because the total settlement amount is in excess of the statutory damages cap afforded to non-hospital charitable organizations, such as Cathedral in the Pines. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 84.006 (West 2011). According to the appellees' trial counsel, initial pretrial settlement negotiations with Cathedral in the Pines contemplated the $500,000 statutory liability cap for actual damages under section 84.006 but later increased when the church's counsel was notified that the appellees would seek exemplary damages against the church in addition to actual damages. We decline to address or consider this statutory cap argument because *Ellender* instructs us to look solely at the terms expressly stated in a settling party's settlement agreement and ignore extrinsic evidence to determine the allocation of damages for settlement agreements after May 8, 1998. *See* 968 S.W.2d at 928.

In this case, the settlement agreement includes the following pertinent language:

Specifically, all monies being paid in settlement of this claim are paid on account of damages sustained by use arising from the occurrence. No portion of the proceeds paid under this Full and Final Release represent exemplary or punitive damages, nor pre-judgment or post-judgment interest.

Because the appellees' settlement agreement with Cathedral in the Pines did not allocate between actual and exemplary damages to the trial court, but rather stated that no part was for exemplary damages, the trial court abused its discretion by not factoring the full settlement credit entitled to Genie. *See id.* Accordingly, we sustain Genie's third issue.

20

## V.    CONCLUSION

We reverse the trial court's judgment, exclusively on the issue of damages, and remand for recalculation of damages in accordance with the full settlement credit that Genie is entitled to.    The remainder of the judgment is affirmed.


_____
GINA M. BENAVIDES,
Justice


Delivered and filed the
6th day of December, 2012.