# IN THE SUPREME COURT OF TEXAS

═══════════════
No. 13-0042
═══════════════

GENIE INDUSTRIES, INC., PETITIONER,

v.

RICKY MATAK, BELINDA MATAK AND MISTY SONNIER, AS REPRESENTATIVE OF
THE ESTATE OF WALTER PETE LOGAN MATAK, DECEASED, RESPONDENTS

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued September 17, 2014**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, and JUSTICE BROWN joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE LEHRMANN and JUSTICE DEVINE joined.

A product manufacturer is not liable for a design defect unless a safer alternative design exists and the defect renders the product unreasonably dangerous—that is, its risks outweigh its utility.[1] The issue is usually one of fact for the jury but may nevertheless be a legal one when the evidence is such that reasonable minds cannot differ on the risk-utility balancing considerations.[2]

---

[1] *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

[2] *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 260–261 (Tex. 1999).

In this case, the users of an aerial lift supporting a worker 40' in the air attempted to move the machine. Signs on the machine and instructions in the user manual warned of the obvious danger: the machine would tip over and the worker would fall to the ground. And that is what happened. So obvious was the danger that although over 100,000 lifts of the same general model have been sold all over the world, the jury was provided with evidence of only three similar accidents involving similar AWP lifts over the past decade—none of which involved the intentional destabilization of a fully-extended 40' lift.[3] The lift cannot be said in any sense to be unreasonably dangerous.

The jury reached a different conclusion. The respective roles of courts and juries must be carefully guarded. The right to trial by jury in civil cases is constitutionally protected because we have, as a polity, determined to lay the resolution of factual disputes at the feet of our peers. But when the facts admit of only one reasonable conclusion, it is the rule of law that must supply the decision, lest jurors be given the very power from which they are intended to protect us, deciding for whatever reasons seem good to them who should and should not prevail.

As we will explain in detail, fully mindful of the respect due the verdict of the jury, our careful review of the record in this case has revealed little evidence of a safer alternative design for the product at issue, and no evidence that the product is unreasonably dangerous. Accordingly, we reverse the judgment of the court of appeals[4] and render judgment for Petitioner Genie Industries,

---

[3] The most recent incident occurred when an AWP–30 lift was pushed around a stage by its base with a person on the elevated platform; the lift tipped over after the platform hit a light. Another injury occurred when an operator working alone, without using the outriggers on what was possibly an AWP lift, tried to inch the elevated lift forward by pulling on a chainlink fence; the operator broke an arm and did not return to the work site. The third incident involved the removal of an outrigger from an extended AWP–30 lift while an operator was in the elevated basket; the lift tipped over and the operator suffered broken bones.

[4] ___ S.W.3d ___ (Tex. App.—Corpus Christi 2012).

Inc.

**I**

Genie Industries, Inc., manufactures and sells a wide variety of aerial lifts throughout the world. An aerial lift is used to raise a worker on a platform to reach the ceilings of tall buildings or other high places. One of these lifts is the Aerial Work Platform-40' SuperSeries, also known as the AWP–40S, pictured here.



**Figure 1**: AWP–40S

The base of the AWP–40S is small, only about 29" x 55"—narrower than a standard door—and sits on wheels. A vertical, telescoping mast is mounted on the base. An enclosed platform

to hold a worker is attached to the top of the mast. A motor extends the mast, raising the platform up to 40' in the air, thus allowing a worker on the platform to reach objects as high as 45–46' above the ground. The AWP–40S is designed to be lightweight and portable. Though the lift weighs roughly 1,000 pounds, it can be rolled around, set up, and operated by a single person. The lift is well-suited for indoor work not accessible by big, heavy machinery. It can pass through ordinary doorways and can be used in tight spaces.

The base of the AWP–40S is too small to support a worker on the platform without tipping over even when the platform is not fully elevated. Before elevating the platform, the machine must be stabilized using outriggers attached to each of the four corners of the base. Each outrigger extends outward diagonally about 3' from the base. At the end of each outrigger is a leveling jack that can be adjusted up or down so that the outrigger is firmly pressed against the floor. The outriggers increase the lift's footprint and its stability, preventing it from tipping over. When the work is done and the mast lowered, the outriggers can be removed to allow the lift to pass through narrow areas. The removable outriggers contribute to the lift's compact design, which is one of its main selling points.

An electromechanical interlock on the lift prevents the platform from being elevated unless all the outriggers are in place and the leveling jacks pressed against the ground. But if the lift becomes destabilized while elevated, it continues to function. Four green lights signal the proper deployment of the outriggers. Several signs on the lift warn users not to release the lift's outriggers while it is in use. One sign, located at eye level on the machine, displays an image of a man pushing the lift while elevated and in use, and states:

DANGER: Tip-over hazard. Attempting to move the machine with the platform raised will tip the machine over and cause death or serious injury.

A warning in the lift's manual states: "Do not adjust or remove the outriggers while the platform is occupied or raised." Even without these warnings, the danger is obvious.

Genie has sold more than 100,000 of its AWP-series lifts worldwide. The few, comparable lifts that are sold on the market are virtually identical to Genie's AWP–40S. The lift's design is governed by and complies with the Occupational Safety and Health Administration standards. The AWP–40S also complies with both the non-mandatory American National Standards Institute standards and, due to the size of Genie's world market share, the national standards in Canada, Europe, and Australia. Out of the millions of times Genie's AWP-series lifts have been used, there are apparently only three reported accidents like the one in issue.[5]

---

[5] We are aware of one other reported case that involves circumstances similar to the accident in this case: *Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161 (S.D.N.Y. 2011) (an auction house worker on an extended Genie personnel lift, model PLC-15P, when the lift's outriggers were not set up and the lift was being wheeled about by a colleague, fell about 20 feet when the lift tipped over) (the court held that Genie must produce incident reports involving other PLC models, including those involving the AWP series, though that series was allegedly larger, heavier, shorter, with a lower center of gravity, fixed outriggers, and an interlock system; the court noted that the impact of those differences on stability would provide data pertinent to whether the model in issue was unreasonably dangerous); *see also Cohalan v. Genie Indus., Inc.*, No. 10 CIV.2415(JMF), 2013 WL 829150, at *1 (S.D.N.Y. Mar. 1, 2013) (same case) (Genie, claiming that it had told the worker's employer that the lift was missing parts and should be retired, sued the employer for contribution and indemnity). Not one other case *nationwide* involves a similar lift and the risk alleged here. *See Adams v. Genie Indus., Inc.*, 903 N.Y.S.2d 318, 321 (2010) (a narrow, interlock-less 1986 lift used without its detachable outriggers; plaintiff fell about 12'); *Ryle v. NES Rentals*, No. CIV.A. 3:04-CV-2800, 2006 WL 931862, at *2 (M.D. Pa. Apr. 11, 2006) (a Genie AWP–40 lift was mounted on a Genie Super-Straddle, a device allowing a lift to be used over seats but which still requires outriggers; because the attachment of this device in effect neutralized the lift's interlock, the lift elevated without outriggers and tipped over); *Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 689, 695 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (a Genie AWP–40 lift on a Super-Straddle elevated, despite the lack of outriggers, and fell); *see also Reed v. Malone's Mech., Inc.*, 765 F.3d 900, 904 (8th Cir. 2014) (scissor lift operator dropped pipe that injured worker below); *N. Am. Specialty Ins. Co. v. Pen Pals Prods., LLC*, No. 5:10-CV-191 MTT, 2011 WL 2976877, at *1 (M.D. Ga. July 22, 2011) (rented Genie four-wheeled, self-propelled articulating boom lift, reaching 45' vertically and 25' horizontally, contacted powerlines); *Williams v. Genie Indus., Inc.*, No. 3:04-CV-217 CAN, 2006 WL 1408412, at *1 (N.D. Ind. May 19, 2006) (worker on the ground, unaware that mobile scissor lift's pothole protection system had engaged, caught his hand on the lift's scissor stack); *Williams v. Genie Indus.*, No. H-03-4579, 2005 U.S. Dist. LEXIS 37429, at *5–7 (S.D. Tex. July 5, 2005) (worker driving a mobile boom lift was

The Cathedral in the Pines Church in Beaumont has an AWP–40S that it uses to reach the ceilings of its buildings. The Church hired Gulf Coast Electric to run fiber optic cable in the ceilings and allowed Gulf Coast's employees, James Boggan and Walter Matak, to use the lift. Initially, they used the lift as instructed. They positioned the lift, deployed the outriggers, and then raised the platform with Matak standing on it. Each time they needed to reposition the lift to reach a different area, they lowered the platform and Matak stepped down. They then raised the leveling jacks, rolled the lift to another location, and redeployed the outriggers.

A church employee watching them work, John Adams, suggested the work would go faster if Matak were not lowered each time the lift was moved. With Matak still elevated, the jacks could be raised a few inches, just enough to allow the lift to roll, then re-lowered. When Boggan expressed reservations about this method, Adams reassured him that he and the other church employees did it "all the time." Actually, what they had done all the time was move the lift with the worker still on the platform, but not with the platform fully raised.

Boggan attempted to follow Adams's suggestion, but after he raised two of the leveling jacks only a few inches, the lift—with Matak still on the platform extended to its full 40' height— suddenly tipped over and crashed to the floor. Matak died of massive injuries to his head, and this action for wrongful death and survivor damages ensued.

injured when the lift's brakes allegedly failed on an incline); *Thome v. Benchmark Main Transit Assocs., LLC*, 927 N.Y.S.2d 260, 262 (App. Div. 2011) (scissor lift); *Ward v. Cedar Key Assocs., L.P.*, 787 N.Y.S.2d 792 (App. Div. 2004) (mobile scissor lift); *Primavera v. Benderson Family 1968 Trust*, 741 N.Y.S.2d 816, 817 (App. Div. 2002) (mobile scissor lift); *Young v. Genie Indus. U.S.*, No. 89665, 2008 WL 603036, at *1 (Ohio Ct. App. Mar. 6, 2008) (worker was hit by lift's boom after supervisor accidentally removed transport pin while lift was still tilted for transport); *Richardson v. Pyramid Hill Sculpture Park*, No. CA2006-06-196, 2007 WL 3243801, at *1 (Ohio Ct. App. Nov. 5, 2007) (40' Genie stick boom lift used on sloping ground; the injured worker claimed that his employer failed to provide a safety belt and adequate training and maintenance).

The jury found that a design defect in the AWP–40S caused the accident. The jury was instructed as follows:

> A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist, there must have been a safer alternative design.
>
> "Safer alternative design" means a product design other than the one actually used that in reasonable probability —
>
> (1)    would have prevented or significantly reduced the risk of the occurrence or injury in question without substantially impairing the product's utility and
>
> (2)    was economically and technologically feasible at the time the product left the control of Genie Industries Inc. by the application of existing or reasonably achievable scientific knowledge.

The jury apportioned responsibility 55% to Genie, 20% to the Church, 20% to Gulf Coast, and 5% to Matak. The trial court rendered judgment on the verdict, and Genie appealed. The court of appeals affirmed, holding that there was legally sufficient evidence to support the jury's design defect finding.[6]

We granted Genie's petition for review.[7]

---

[6] ___ S.W.3d ___ (Tex. App.—Corpus Christi 2012).

[7] 57 Tex. Sup. Ct. J. 306, 307 (Mar. 21, 2014).

7

## II

"The law of products liability does not guarantee that a product will be risk free"[8] but imposes liability only for defective products that are "unreasonably dangerous to the user or consumer."[9]

> To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery.[10]

A product is unreasonably dangerous when its risk outweighs its utility.[11] Genie argues that the plaintiffs produced no evidence that a safer alternative design for the AWP–40S existed or that the risk of an accident like Matak's outweighs the lift's utility. In assessing the evidence, we cannot, of course, "substitute [our] judgment for that of the [jury], so long as the evidence falls within [the] zone of reasonable disagreement."[12] But "[w]here reasonable minds cannot differ, the issue is one of law rather than one of fact."[13]

We consider first the evidence of a safer alternative design for the AWP–40S, and then turn to an analysis of the lift's risks and utility.

---

[8] *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 381 (Tex. 1995).

[9] *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–789 (Tex. 1967) (adopting the RESTATEMENT (SECOND) OF TORTS § 402A (1965)).

[10] *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

[11] *Id.*

[12] *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 1995).

[13] *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 261 n.26 (Tex. 1999) (internal quotation marks omitted) (though factual disputes are for a jury to resolve, "whether the product is unreasonably dangerous as designed may nevertheless be a legal [question] if reasonable minds cannot differ on the risk-utility analysis considerations").

## III

"Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe."[14] A safer alternative design is one that would have prevented or significantly reduced the risk of the injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time.[15] This design need not be actually built and tested; a plaintiff must show only that the alternative design was "capable of being developed."[16] Importantly, however, the alternative design must not be one that would "under other circumstances, impose an equal or greater risk of harm."[17]

> When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude.[18]

The plaintiffs' evidence of a safer alternative design for the AWP–40S came from two sources. Ken Zimmer, an expert on aerial lift design and manufacture, testified to three alternative designs, referred to as the "automatic drop-down" design, the "pothole protection" design, and the "chain and padlock" design. A fourth design—the "block" design—was suggested by Matak's attorney during direct examination of Genie's expert, Rick Curtin. We set out the evidence of each design below.

---

[14] *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995) (internal quotation marks omitted).

[15] TEX. CIV. PRAC. & REM. CODE § 82.005(b); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999).

[16] *Gen. Motors Corp.*, 997 S.W.2d at 592.

[17] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998).

[18] RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 2 cmt. f (1998) (cited in *Uniroyal*, 977 S.W.2d at 337).

*Automatic Drop-down Design*

Zimmer's automatic drop-down design idea is fairly simple and builds on technology already a part of the AWP–40S. As noted above, green lights indicate that the outriggers are properly deployed, and the lift cannot be operated unless all four of the outriggers are in place and pressing on the ground. But releasing an outrigger after the lift is in operation will not alter its function. The automatic drop-down design would change that. Releasing an outrigger would trigger an alarm and automatically begin lowering the platform at one foot per second, reducing the height from which a worker would fall if the lift still tipped over. Zimmer testified that the design would have saved Matak's life.

But nothing in the record indicates that the automatic drop-down design could have stabilized the lift or would have lowered the platform enough to prevent Matak's fall and serious injuries. Zimmer, himself, acknowledged that falls from 10 or 15 feet could be fatal, and the record, read generously, does not indicate that the platform could have reached a lower height. Absent more, Zimmer's testimony otherwise is the mere *ipse dixit* of a credentialed witness.

But an even greater problem is the added danger that this design would cause. There was evidence that a sudden, unexpected movement of the platform could startle a worker, creating an even more dangerous situation when working with live electrical wires or leaving the worker hanging onto ceiling rafters as the platform suddenly descended. Even if the design could have prevented some or all of Matak's injuries, it could just as well have increased the risks of injury to himself and others.

*Pothole Protection Design*

Zimmer's pothole protection design would simply incorporate into the AWP–40S a feature on many mobile lifts. When a mobile lift is raised beyond a certain height, small stabilization bars—also called outriggers—automatically deploy from the vehicle, not all the way to the ground, but hovering just above it to reduce the machine's ground clearance. This prevents the vehicle from violently tipping if one of its wheels enters a pothole. The lower the ground clearance, the less of a threat undetected potholes present.

But this design is not used in stationary lifts. Indeed, stationary lifts, which are much lighter than their mobile counterparts, require larger outriggers that stabilize the machine by extending farther out and engaging with the ground instead of merely minimizing ground clearance. For these machines, the threat of tipover is based on the weight distribution of the machine itself, not the possibility of being thrown off center by a pothole.

If the modified pothole technology were incorporated to Genie's lift, the existing outriggers would need to be permanently attached to the lift so that they could be mechanized. Permanent attachment and mechanization would presumably add to the lift's weight and size, thereby diminishing one of the lift's key utility factors—its versatility. Furthermore, this design would still require that the user manually lower the leveling jacks for the lift to operate safely. Nothing in either Zimmer's testimony or the record indicates how, under this design, the jacks could be automated or otherwise kept from being manipulated during use. Put simply, automating the outriggers leaves the lift vulnerable to the very misuse that occurred here. The pothole protection technology only addresses the automation of the outrigger arms, and this would not have prevented the accident in

11

this case; here, it was the leveling jacks that were released, not the outrigger arms themselves.

Zimmer's conclusion that the design would have been safer for Matak has little support in the evidence, and there is no evidence the design would be safer in other circumstances.

### *Chain and Padlock Design*

Zimmer's chain and padlock design was the simplest of all: the leveling jack handles would be chained and padlocked, and the key held by the worker on the platform, preventing the outriggers from being raised while the lift is extended. The obvious flaw in the design is that it would do little to prevent misuse. The key could simply be left with the person on the ground, or even thrown down to him by the worker on the platform. It cannot be imagined that users intent on disregarding multiple, plain, obvious warnings of danger would be stymied by the need for a key. Indeed, it is hard to imagine why users seeking to avoid the inconvenience of lowering the platform to move the lift would accept the inconvenience of chaining and locking the jack handles every time the outriggers were set.

### *Block Design*

Matak's counsel himself suggested a fourth design during his examination of Genie's expert: two of the lift's four wheels would be replaced by a block so that the lift could not be moved without tilting it back on its two wheels, and off its block, to roll the machine like a loaded dolly or a two-wheeled cart. This design would not directly ensure the proper deployment of the outriggers, but the obvious necessity of tilting the machine to move it would discourage attempts to move the machine while its platform was elevated. Since releasing the outriggers would not facilitate moving the machine, there would be no incentive to attempt the kind of egregious misuse engaged in by Boggan

12

and Adams.

While a two-wheel design would make it impossible to move a lift with the platform raised, a two-wheeled lift would also be much harder to move than a machine on four wheels. The AWP–40S weighs about 1,000 pounds and can be tipped back onto a second set of wheels, mounted on the back of the machine to move the lift through doorways and other low clearance areas. If every move required putting a machine in that mode, every move would become that much more difficult. The impact of this design would be felt in the utility of the machine.

*　　*　　*　　*　　*

To impose liability on Genie, the plaintiffs must have presented evidence of an alternative design that (1) would have been safer for Matak and prevented or significantly reduced his risk of injury, (2) would not have been less safe in other circumstances and increased the risks to other users, (3) would not have substantially impaired the lift's utility, and (4) was economically and technologically feasible at the time. Genie argues that there was no evidence to support a design of this kind. We disagree. The evidence of a safer alternative design is weak, but we cannot say that it is less than a scintilla. Accordingly, we turn to Genie's second argument, that there is no evidence the AWP–40S is unreasonably dangerous.

## IV

Whether a defective design renders a product unreasonably dangerous depends on whether the product's risks outweigh its utility, considering:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably

expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.[19]

This balancing is for the jury unless the evidence allows but one reasonable conclusion. In *Caterpillar, Inc. v. Shears*, for example, the issue was whether a front-end loader with a removable rollover protection structure was unreasonably dangerous.[20] Fixing the structure to the loader would have precluded serious injuries to operators and others but "would have completely precluded some of the uses for which the product was designed and to which it was put".[21] We concluded that the loader was not unreasonably dangerous as a matter of law.[22]

Commenting on *Caterpillar*, we have observed that "[e]ven if a product's utility were less severely impacted by a design change to reduce the risks associated with the product's use, the issue of whether the product is unreasonably dangerous as designed may nevertheless be a legal one if reasonable minds cannot differ on the risk-utility analysis considerations."[23] An example is *Timpte Industries, Inc. v. Gish*.[24] The product in that case was a large, open-top trailer being used to haul

---

[19] *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

[20] 911 S.W.2d 379, 380–381 (Tex. 1995).

[21] *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 260 (Tex. 1999) (discussing *Caterpillar*).

[22] *Caterpillar*, 911 S.W.2d at 384.

[23] *Hernandez*, 2 S.W.3d at 260–261.

[24] 286 S.W.3d 306 (Tex. 2009).

14

bulk fertilizer.[25] Atop the sides of the trailer was a rail about 5" wide.[26] To help load the trailer, the truck driver climbed up onto the rail, attempted to balance himself on it, and fell some 9½' to the ground.[27] He claimed that the rail was too narrow, slippery, and subject to tripping hazards.[28] But the evidence showed that a wider rail would have increased the cost and weight of the trailer and would have presented a more inviting danger to users.[29] We held, as a matter of law, that the risk, which was fully obvious to all, did not outweigh the trailer's utility, and that the trailer was not unreasonably dangerous.[30]

On the other hand, in *Uniroyal Goodrich Tire Co. v. Martinez*, we held that there was a factual dispute for the jury to decide.[31] There, Martinez was injured when a 16" tire he was attempting to mount on a 16.5" rim exploded.[32] That such mismatches occur frequently and easily was well known in the industry—hence the warnings and recommended safety precautions.[33]

---

[25] *Id.* at 307–308.

[26] *Id.* at 308.

[27] *Id.* at 308–309.

[28] *Id.* at 309.

[29] *Id.* at 313–314, n.7.

[30] *Id.* at 314–315.

[31] 977 S.W.2d 328, 331 (Tex. 1998) (the mere fact that a product bears an adequate warning does not conclusively establish that the product is not defective).

[32] *Id.* at 331–332 (the Martinezes claimed at trial that the tire was defective because it failed to incorporate a safer alternative bead design that would have kept the tire from exploding, and that the manufacturer's failure to adopt this alternative design was negligence).

[33] *Id.* at 333.

Martinez himself knew of the danger, but testified that he mistakenly believed, because the old tire was 16", that the rim was also 16".[34] He might have avoided injury from an explosive mismatch between the tire and the rim if he had available (and used) a tire-mounting machine, a safety cage or an extension hose while inflating the tire.[35] Nonetheless, because even experienced operators like Martinez could mistakenly believe they were in compliance with the warning against mounting a 16" tire on a 16.5" rim, there remained a latent risk that a person unaware he was mounting a 16" tire on a mismatched 16.5" rim would fail to appreciate the concomitantly increased danger posed by an unsecured tire.[36] The Court concluded that whether there was a safer alternative design for the tire that would have decreased the likelihood of an explosion was a question for the jury.[37] In the case at hand, a person on the ground can readily see that lifting the outriggers on a lift, while the platform bearing his colleague remains 40' in the air, puts that colleague at serious risk of a potentially deadly fall. The ground-based lift-user cannot mistakenly believe that his actions are safe, as Martinez mistakenly believed based on the misapprehension that the tire and rim matched.[38]

In the case before us, the evidence of the AWP–40S's utility is undisputed. The lift is designed to be small, lightweight, portable, and relatively inexpensive. To accommodate a wide variety of working environments, the lift uses outriggers with manual leveling jacks to stabilize the

---

[34] *Id.* at 332, 340.

[35] *Martinez*, 977 S.W.2d at 332.

[36] *Id.* at 337.

[37] *Id.* at 331, 337–338.

[38] *See id.* at 332, 340.

lift once it is positioned. This allows the lift to be used on surfaces that are not completely flat, such as the gradually sloped floor in this case, without having to sacrifice stability. Furthermore, the lift is designed so that the outriggers are removable in order to keep the lift as narrow as possible when being moved. This allows the AWP–40S to fit through standard door frames, therein expanding the range of uses for the machine. As previously explained, the lift also incorporates a mechanical interlock to make sure that all four outriggers are installed and the leveling jacks are firmly pressed against a given workspace. Until the outriggers are properly set, the lift cannot be operated. This maximizes the utility of the lift while still ensuring that it is used safely.

The risk is that a user will ignore the instructions in the user manual, the signs on the lift itself, and the danger, obvious to even a casual observer, that the lift will tip if the outriggers are removed when a person is on a fully elevated platform. So obvious is the risk of danger from misuse of the lift that the evidence does not reflect a single other accident involving a fully extended 40' lift. Church employees testified that they sometimes released the outriggers with the platform elevated, but only if the worker could jump down to avoid injury. The plaintiffs introduced evidence of three similar accidents,[39] but in none is there an indication that the platform was fully elevated. Genie's witness testified that there may been eight or ten other instances "of not doing it right" when using the lift, but again, none bear any indication that they, too, involved a fully elevated platform. The undisputed evidence is that Genie has sold more than 100,000 AWP model lifts all over the world,

---

[39] Once again, we are aware of but one other case—across the entire United States—in which a similar Genie lift was intentionally destabilized while elevated and fell. *See Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161, 162 (S.D.N.Y. 2011) ("At the time the lift fell over, it was being wheeled around the warehouse by a colleague of Mr. Cohalan's, and the outriggers with which the lift was equipped in order to prevent tip-over were not set up.").

which have been used millions of times. But the record does not reflect a single misuse as egregious as that in this case.

The five factors to be considered in determining whether a product's risk outweighs its utility,[40] with which we began this discussion, conclusively establish that the AWP–40S is not, on this record, unreasonably dangerous. The first is whether the gravity and likelihood of injury outweighs the lift's utility. While misuse of the lift can result in the most serious injury, as this case illustrates, the likelihood of its occurrence is all but nonexistent. In *Martinez*, the likelihood of injury was greater, and more importantly, even an experienced user might not appreciate the danger in a particular circumstance. Here, the danger was patent. The second factor asks whether there is a substitute that would meet the same need and not be unsafe or unreasonably expensive. There is no evidence of one. The third factor is whether there is a safer alternative design. As we have already explained at length, there is only slight evidence of such a design. The fourth factor is whether the danger of misuse is obvious and readily avoidable. The risk of tip-over is both. One need only look at the machine to appreciate this truth. And the lift's history of use in the world further confirms this fact. The last factor considers ordinary consumers' expectations. Again, the danger of misuse is obvious, even to someone not trained in handling the AWP–40S. These factors require the conclusion that the AWP–40S is not unreasonably dangerous.

We agree with the dissent that it is completely irrelevant what we would have done had we been jurors in the case, although it seems odd that the dissenting JUSTICES would feel constrained

---

[40] *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

18

to repeat three times that they probably would have sided with Genie. The dissent acknowledges that the AWP–40S cannot be unreasonably dangerous absent evidence that the gravity and likelihood of injury outweighs its utility, but then it concludes that a single accident is enough to show likelihood. The evidence here shows that while it is very likely that users of the lift will not read or follow the user manual or the warning signs on the machine, and likely that they will try to release the outriggers and move the lift with someone on a partially elevated platform, the chance that anyone would attempt to do so with the platform fully elevated is only one in millions. The risk of misuse in this case cannot in any sense be said to be likely.

As we said in *Caterpillar*, "[t]he law of products liability does not guarantee that a product will be risk free," only that it will not be unreasonably dangerous.[41] There is no evidence in the record before us that the AWP–40S is unreasonably dangerous.

*  *  *  *  *

Accordingly, we reverse the judgment of the court of appeals and render judgment for Petitioner.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: May 8, 2015

---

[41] 911 S.W.2d 379, 381–382 (Tex. 1995).