**Ralph S. JANVEY, In His Capacity as Court–Appointed Receiver for The Stanford International Bank, Limited, et al, Plaintiff–Appellant Cross–Appellee**

v.

**DILLON GAGE, INCORPORATED OF DALLAS; Dillon Gage, Incorporated, Defendants–Appellees Cross–Appellants**

No. 15-11211
Consolidated w/16-10212

United States Court of Appeals, Fifth Circuit.

FILED May 5, 2017

Kevin M. Sadler, Baker Botts, L.L.P., Palo Alto, CA, David Arlington, Stephanie Frederique Cagniart, Evan A. Young, Attorneys, Baker Botts, L.L.P., Austin, TX, for Plaintiff–Appellant Cross–Appellee.

Jeffrey Scott Levinger, Levinger, P.C., Priya A. Bhaskar, Laura Fontaine, Orrin Lea Harrison, III, Michael Justin Lang, I, Esq., Attorney, Gruber Elrod Johansen Hail Shank, L.L.P., Dallas, TX, for Defendants–Appellees Cross–Appellants.

Before WIENER, CLEMENT, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case concerns more fallout from Allen Stanford's Ponzi scheme. Plaintiff–Appellant Ralph Janvey ("Janvey") is the court-appointed receiver tasked with marshalling and distributing the assets of the Stanford entities. This suit relates to Stan-

ford Coins and Bullion ("SCB"), a coin and bullion company previously owned by Allen Stanford. SCB sold coins and metals to the public. Defendant–Appellee Dillon Gage Inc. of Dallas ("Dillon Gage") is a wholesaler of metals, bullion, and coins and was SCB's largest supplier.

Janvey alleges that six transfers from SCB to Dillon Gage were fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA") and should be returned to the receivership. Following trial, a jury disagreed, finding that the six transfers were not fraudulent. Dillon Gage then sought attorney's fees, which the district court denied. Janvey appealed, challenging the jury verdict and instructions; Dillon Gage cross-appealed, challenging the denial of the fee award. We AFFIRM.

I

For almost two decades, Allen Stanford and his co-conspirators perpetrated a multi-billion-dollar Ponzi scheme using a global network of more than 130 entities. The Ponzi scheme sold fraudulent certificates of deposit to investors. Proceeds from investors were used to pay other investors, fund Allen Stanford's lifestyle, and finance other Stanford entities.

One entity related to the scheme was SCB. SCB received capital contributions and loans from other Stanford entities. Indeed, until late 2008, SCB had a line of credit with Stanford International Bank. However, SCB did not sell Stanford certificates of deposit. Instead, SCB operated as an otherwise ordinary coin and bullion business, buying and selling coins and metals. It purchased coins and metals from wholesalers and resold them to retail customers at a markup. SCB ran its business operations through an operating account, that is, when SCB received customers' money, it deposited the funds into SCB's operating account, and the operating ac-

count was then used to pay SCB's business expenses. SCB was led by its President Joseph Frisard and its Vice President of Operations Scott Terry. SCB was never profitable, although by 2009 its revenues were rising.

At all relevant times, Dillon Gage was managed by its President of the Metals Division Terry Hanlon and General Manager Ira Fritz. SCB became Dillon Gage's customer in 2004. The relationship grew and by early 2009, Dillon Gage was SCB's largest wholesale supplier. SCB would place orders with Dillon Gage through Dillon Gage's trading desk. Dillon Gage would then either supply the goods to SCB or ship the goods directly to SCB's customers (called "drop-shipping"). SCB would then pay Dillon Gage for the orders, with payment usually due ten days to two weeks after shipment. However, SCB was consistently late in its payments to Dillon Gage.

During this business relationship, Dillon Gage extended SCB a line of credit, which, by 2009, had grown to $2 million. In January 2009, SCB's account balance with Dillon Gage had grown to about $2.3 million. During this time, Hanlon became increasingly concerned with the age and amount of SCB's outstanding invoices, and in response, on January 20, 2009, he traveled to SCB's headquarters to meet with Frisard. At the meeting, Frisard assured Hanlon that SCB had already mailed a payment to Dillon Gage and was anticipating a big order that could be used to pay off the rest of SCB's balance. Frisard also showed Hanlon SCB's offices; Hanlon observed significant inventory and a room full of salespeople taking customers' orders.

As it turned out, the check that Frisard promised was actually only for $250,000. Concerned by the low payment, Hanlon called Scott Terry on January 22, 2009, seeking further payment. Hanlon told Ter-

ry that he was uncomfortable with SCB's slow rate of payment and high balance and asked for an explanation. Terry explained that SCB was suffering from cash flow problems, in part because it had lost its line of credit with Stanford International Bank. Terry further explained that SCB was working on a big deal and that when it received payment, it could use the money to pay Dillon Gage. Terry suggested that if the big deal failed SCB could collect its unpaid accounts receivables, liquidate inventory, or seek additional capital from Stanford. Hanlon responded that Dillon Gage could not keep shipping SCB inventory until it was paid.

The "big deal" referenced by both Frisard and Terry was a deal with the Pre-War Art Gallery (the "Gallery"). The Gallery wanted to purchase 101 gold bars from SCB for approximately $3 million (the "Gallery Deal").

Soon after the January 22 phone call, Dillon Gage stopped shipping orders to SCB and its customers. This was not entirely out of the ordinary; Dillon Gage had halted shipments to SCB before. From January 23 until January 30, SCB made three payments to Dillon Gage, totaling approximately $1.26 million: $501,326.30 (January 23); $394,567.40 (January 27); and $368,491.51 (January 30).

On February 2, 2009, the Gallery placed its order with SCB for 101 gold bars, wiring $3,028,613 to SCB for the order. Frisard then ordered the gold bars from Dillon Gage and provided an upfront payment of approximately $3 million to Dillon Gage. Although the order was placed on February 2, the order did not need to be shipped to the Gallery until March 4.

Following SCB's $3 million payment, Dillon Gage immediately began shipping SCB's backlogged orders, applying the $3 million payment to the oldest invoices first. In total, Dillon Gage shipped $1,947,453.65

in coins and bullion to SCB or its customers in the time between when shipping resumed and when the receivership was imposed.

On February 6 and February 13, SCB made two further payments to Dillon Gage of $366,171.50 and $486,959.86, respectively. Following these payments, SCB had a credit balance with Dillon Gage of $1,069,355. Nonetheless, SCB still owed Dillon Gage more money to complete payment on the Gallery Deal.

On February 17, 2009, SCB was shut down by Janvey, the court-appointed receiver. At the time it was shut down, SCB had over $1 million in cash and $300,000–$400,000 in uncashed checks on hand. SCB's management believed that the company had sufficient cash, or access to capital, to complete the Gallery Deal.

In September 2010, Janvey filed this lawsuit. He alleged that the following payments from SCB to Dillon Gage were fraudulent transfers under TUFTA and therefore should be returned to the receivership:

- January 23, 2009–$501,326.30
- January 27, 2009–$394,567.40
- January 30, 2009–$368,491.51
- February 2, 2009–$3,002,639.10
- February 6, 2009–$366,171.50
- February 13, 2009–$486,959.86

The parties proceeded to trial in July 2015. The jury was asked two questions: (1) were the transfers from SCB to Dillon Gage fraudulent transfers?; and (2) did Dillon Gage accept the transfers from SCB in good faith?

At trial, both parties agreed that Dillon Gage applied the $3 million payment related to the Gallery Deal to its oldest debts with SCB. Both parties also presented significant evidence of SCB's financial condition. Janvey's expert, Karyl Van Tassel,

opined that SCB was insolvent because it was generally not paying its bills as they became due, although she did not distinguish in her analysis between past due bills and general liabilities. Moreover, neither Janvey nor Van Tassel identified any specific debts owed by SCB to anyone other than Dillon Gage. Van Tassel further testified that SCB never generated a profit, had negative equity, and had more liabilities than available cash. However, Van Tassel did not testify that SCB's liabilities were greater than its assets because she never valued SCB's assets.

Dillon Gage introduced testimony concerning SCB's finances from Frisard, Terry, and its industry expert, Michael Fuljenz. Dillon Gage's witnesses testified that SCB had significant non-cash assets including: inventory, uncashed checks, and uncollected accounts receivables. Dillon Gage's witnesses also testified that businesses in the coin and bullion industry typically suffer from cash flow problems in the beginning of the calendar year because, among other reasons, most coin companies buy inventory in the beginning of the year.

The jury returned a verdict in favor of Dillon Gage, finding that none of the six transfers was fraudulent. The district court denied Janvey's motion for judgment as a matter of law. Following judgment,

Dillon Gage filed a motion seeking attorney's fees under TUFTA. The district court denied the motion. Janvey appeals the denial of his motion for judgment as a matter of law and Dillon Gage cross-appeals the denial of its motion for attorney's fees.

## II

Janvey raises two challenges to the jury verdict. First, he argues that a reasonable jury was required to find that SCB's transfers to Dillon Gage were fraudulent. Second, he argues that the jury instructions were erroneous. We reject both challenges.

## A

 Janvey first argues that, as a matter of law, each of the challenged transfers was fraudulent.[1] We review a district court's denial of a motion for judgment as a matter of law de novo, applying the same standards as the district court. *See, e.g., Ill. Cent. R.R. Co. v. Guy*, 682 F.3d 381, 392–93 (5th Cir. 2012). Judgment as a matter of law is proper only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). "This

---

1. As a preliminary matter, Dillon Gage argues that Janvey does not have standing to assert its fraud claim because, Dillon Gage claims, the fraud claim is brought on behalf of the Gallery. "[This Court] review[s] questions of statutory standing de novo." *Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014). "[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013). Here, Janvey is not bringing a common-law fraud claim on behalf of the Gallery. Instead, he is bringing a statutory TUFTA claim on behalf of SCB—an entity under his

receivership. *Id.* at 192–93 (looking to the claims asserted in the complaint to determine what claims were asserted by the receiver). Janvey has standing to bring a TUFTA claim on behalf of a Stanford entity. *Id.* at 192 ("[W]e conclude that the Receiver has standing to assert the claims of [a Stanford entity], and any other Stanford entity in receivership, against the [defendants] to recover the contributions made to them without reasonably equivalent value by the Stanford Ponzi operation."); *see also Janvey v. Suarez*, 978 F.Supp.2d 685, 697–98 (N.D. Tex. 2013). Thus, Janvey has standing to bring these TUFTA claims on behalf of SCB.

will only occur if the facts and inferences point so strongly and overwhelmingly in the movant's favor that jurors could not reasonably have reached a contrary verdict." *Id.* (quoting *Brown v. Sudduth*, 675 F.3d 472, 477 (5th Cir. 2012)). "In evaluating such a motion, the court must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury." *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 333 (5th Cir. 1997). "After a jury trial, [the] standard of review is especially deferential." *Abraham*, 708 F.3d at 620 (citation omitted, alteration in original).

■■■ Janvey brought all of his claims under TUFTA. TUFTA pursues one overriding goal: "to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015). To that end, a creditor may sue a third party that received a fraudulent transfer from the debtor and recover its losses by voiding that transaction. *See In re IFS Fin. Corp.*, 669 F.3d 255, 261–62 (5th Cir. 2012). A transfer is fraudulent under TUFTA if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex Bus. & Com. Code § 24.005(a)(1). A fraudulent transfer can be proven in two ways: directly or circumstantially. When direct evidence of fraudulent intent exists, as when a debtor "admits the fraud," then "[i]ntent ... can be decided as a matter of

law." *BMG Music v. Martinez*, 74 F.3d 87, 90 (5th Cir. 1996). But "[s]ince [this] intent ... is seldom susceptible of direct proof, courts have relied on badges of fraud," eleven of which are listed in the statute, as circumstantial evidence of fraud. Uniform Fraudulent Transfer Act ("UFTA"), Prefatory Note; *see also* Tex. Bus. & Com. Code § 24.005(b).

### 1

■■■ Janvey first contends that he provided the jury with irrefutable direct evidence of fraud. He argues that SCB misappropriated the Gallery's $3 million payment in order to pay down SCB's old debts to Dillon Gage. Janvey contends that this misappropriation constitutes direct evidence of fraudulent intent because "a debtor acts with fraudulent intent when it misappropriates funds from one creditor to pay another, and when it disregards the substantial risk that its creditors will be hindered, delayed, or defrauded as a result." [2] That is, Janvey relies on the theory that there is direct evidence of fraud when a debtor uses Creditor A's money to pay off its debts to Creditor B *and* the debtor knows, or must know, that "the natural consequence of its action" is that Creditor A will be hindered, delayed, or defrauded in the collection of its debts. *See In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) ("*Sentinel I*").

■■■ However, the jury could have concluded that SCB did not disregard a substantial risk that the Gallery would go unpaid (here, not receive its gold bars)

---

**2.** The mere fact that SCB used money from the Gallery to pay its antecedent expenses is not per se fraudulent. SCB would have upheld its end of the bargain with the Gallery if it delivered gold on March 4, regardless of which specific money SCB used to complete the deal. After all, money is fungible. The fact

that the Gallery may have preferred that SCB segregate its money does not indicate fraud. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, No. CV 6990-VCL, 2015 WL 6157759, at *20 (Del. Ch. Oct. 20, 2015), *aff'd*, No. 210, 2016, 2016 WL 6438209 (Del. Oct. 31, 2016).

when SCB used the Gallery's money to pay its antecedent debt to Dillon Gage. Specifically, the jury rationally could have concluded that SCB thought that it had sufficient assets to complete the Gallery deal without having to resort to the use of a new customers' money. The jury was told that SCB's revenues were rising— going from about $36 million in 2007 to $60 million in 2008. And, the jury heard evidence from which it could have inferred that this revenue growth would have continued. For example, in early 2009, SCB began a new national advertising campaign. From these facts, the jury could have inferred that, over time, SCB would have generated enough profit to pay down its trade creditor debt without needing to use new customer funds.

But the jury did not need to draw this inference because the jury also heard evidence suggesting that SCB had sufficient saleable inventory in the beginning of 2009 to complete the Gallery transaction, even without growing its business. In order to complete the Gallery Deal, SCB needed to pay Dillon Gage an additional $1.9 million by March 4, 2009. At the time the receivership began, SCB had over $1 million in cash and between $300,000 and $400,000 in uncashed checks on hand. In addition, SCB owned approximately $3 million worth of rare coins and approximately $4.6 to $4.9 million in total inventory. Dillon Gage's industry expert testified that SCB could have easily liquidated its inventory to raise capital because the market for coins and bullion was rising in early 2009. SCB had additional assets that could have been sold to complete the Gallery Deal, such as approximately $1.3 to $1.5 million in unpaid accounts receivables and customer lists that, according to Dillon Gage's industry expert, could be sold. Finally, SCB's employees testified that SCB intended to complete, and could have completed, the Gallery Deal. Based on this evidence, the jury reasonably could have found that SCB could have raised sufficient capital to pay Dillon Gage to complete the Gallery Deal without using new customers' money. Accordingly, the jury could have properly rejected Janvey's direct evidence of fraud theory.[3]

2

Janvey next argues that he provided the jury with significant circumstantial evidence of fraud. At trial, Janvey attempted to prove two badges of fraud: insolvency and incurrence of a substantial debt at the time of the challenged transfers. *See* Tex. Bus. & Com. Code § 24.005(b)(9), (10). Janvey proved one badge—incurrence of substantial debt at the time of the challenged transfers—but failed to prove insolvency as a matter of law.[4]

**3.** Janvey relies primarily on two cases to support its direct evidence of fraud theory: *Sentinel I* and *GE Capital Commercial, Inc. v. Worthington National Bank*, 754 F.3d 297 (5th Cir. 2014). Neither case supports Janvey's argument on this factual record, because a debtor does not act with fraudulent intent when it incurs a new debt so long as it has a reasonable expectation that it can pay that debt off. *See, e.g., Vertin,* 2015 WL 6157759, at \*19. That is, because the jury could have found that SCB reasonably believed that it could complete the Gallery deal without churning funds from new customers to pay old debts, the cases Janvey cites are

inapposite. In both *Sentinel I* and *GE Capital* the debtor could not have reasonably believed that it could make payment on the debts it incurred. *See Sentinel I,* 728 F.3d at 667 (noting that the debtor must have known that the "natural consequence of its actions" was to deny its creditors repayment); *GE Capital,* 754 F.3d at 300 (noting that the alleged fraudster took the creditor's money for his own purposes, outside the scope of the debtor's business).

**4.** The challenged transfers occurred between January 23 and February 13, 2009. Janvey argues that those transfers occurred shortly

Under TUFTA, it is a badge of fraud if "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." Tex. Bus. & Com. Code § 24.005(b)(9). Insolvency can be proven in two ways: by showing that "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," or by showing that the debtor "is generally not paying the debtor's debts as they become due." Tex. Bus. & Comm. Code § 24.003(a), (b). Both parties focus on the second test.[5] TUFTA provides that "[a] debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent." *See* Tex. Bus. & Com. Code § 24.003(b). Janvey argues that the trial evidence conclusively established that SCB was not generally paying its debts as they came due and was therefore presumptively insolvent under TUFTA.

■■■■ "The question of insolvency is to be determined as of the time of the conveyance." *United States v. Fritz*, No. SA-12-C-550-FB (HJB), 2014 WL 12540471, at *4 (W.D. Tex. Jan. 7, 2014), *report and recommendation adopted*, 2014 WL 12537176 (W.D. Tex. Feb. 24, 2014), *aff'd*, 608 Fed.Appx. 259 (5th Cir. 2015) (unpublished) (quoting *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App.—Tyler 2000, pet. denied)). "[V]arious factors are relevant to determine whether a debtor's payment of its debts shows insolvency." *Williams v.*

*Hous. Plants & Garden World, Inc.*, 508 B.R. 19, 30–31 (S.D. Tex. 2014) (quoting *In re Arriola Energy Corp.*, 74 B.R. 784, 790 (S.D. Tex. 1987)). "Among them are the number and amount of the unpaid debts in relation to the size of the debtor's operation; the age and number of unpaid debts; the total amount of indebtedness; and the number of unpaid creditors[.]" *Id.* (citing *Arriola Energy Corp.*, 74 B.R. at 790); *accord* Unif. Fraudulent Transfer Act § 2(b) & cmt. 2; *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 402 (S.D. Tex. 2008) (looking to the same presumption under Delaware and New Jersey law and noting that "[t]he most commonly used factors are: (1) the number of debts; (2) the amount of delinquency; (3) the materiality of non-payment; and (4) the nature of the debtor's conduct of its financial affairs").

■■■■ The jury heard evidence from which it could infer that SCB was generally paying its debts as they came due. Other than the bills owed to Dillon Gage, Janvey did not identify any specific bills that were due and that SCB did not pay. And even with regard to the debts owed to Dillon Gage, the jury heard conflicting evidence concerning whether SCB was generally paying Dillon Gage as its debts came due. On the one hand, the jury heard testimony indicating that, from its inception, SCB was "historically late paying [its] bills" to Dillon Gage and was a "slow-pay."

---

before or after an incurrence of substantial debt because SCB increased its trade-creditor debt by over $2 million in early 2009 and SCB incurred an additional approximately $3 million debt on February 2, 2009 when it took payment from the Gallery (because at that point, SCB owed gold to the Gallery). Dillon Gage does not meaningfully contest this analysis.

**5.** At trial, Janvey did not rely on the first test of insolvency, called "balance-sheet insolven-

cy." Here too, Janvey does not attempt to prove balance-sheet insolvency. In any event, because Janvey did not attempt to value all of SCB's assets, there is no way to conduct a complete analysis of balance-sheet insolvency. *See In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121–22 (5th Cir. 1994) (reversing a finding of insolvency because the district court heard no evidence regarding the value of the debtor's assets).

On the other hand, the jury heard that SCB "paid [its] bills every Friday," and had no creditors who were not being paid. Courts interpreting TUFTA have concluded that evidence merely showing a significant debt and occasional late payments does not establish insolvency as a matter of law. *See Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 11, 18 (S.D.Tex.2014) (rejecting summary judgment on the insolvency badge despite evidence showing that "during the relevant periods, [the transferor] was behind on payments to some of its creditors," and evidence showing that "[the transferor] refinanced some debt that was due and incurred substantial overdraft fees in the year the challenged transfers began"); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 584 (Tex.App.2012) ("[Creditors] merely proved [Debtor] was failing to pay the debt for which judgment had been taken and was delinquent on another debt. This evidence was insufficient to establish that [Debtor] was generally not paying her debts as they became due."); *In re Iridium Operating LLC*, 373 B.R. 283, 343 (Bkrtcy.S.D.N.Y.2007) ("[T]he failure to make one $90 million interest payment one month prior to its bankruptcy filing does not, by itself, support a finding that Iridium was not paying its debts as they became due."). Accordingly, the jury was not required to find that SCB was insolvent at the time of the transfers.

### 3

Viewing both the direct and circumstantial evidence of fraud as a whole we conclude that a rational jury could have found that SCB did not act with fraudulent intent. Janvey only established one badge of fraud—incurrence of a substantial debt close in time to the transfers—as a matter of law. Against this single badge of fraud, the jury heard significant evidence from which it could have inferred that SCB did

not make the transfers with fraudulent intent. Accordingly, we affirm the jury verdict.

### B

Janvey next argues that a new trial is needed because the jury instructions were misleading and erroneous. Janvey raises four challenges to the jury instructions. We conclude that each is without merit.

■■■ Jury instructions are reviewed for abuse of discretion. *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010). Instructions that hinge on a question of statutory construction are reviewed de novo. *GE Capital*, 754 F.3d at 302. Reversal is appropriate when the "charge as a whole leaves [the court] with substantial and ineradicable doubt whether the jury [was] properly guided in its deliberations" and the challenged instructions, separately or collectively, "affected the outcome of the case." *Jowers*, 617 F.3d at 352 (quoting *Bender v. Brumley*, 1 F.3d 271, 276–77 (5th Cir. 1993)). Similarly, when a challenge involves the trial court's failure to give a requested jury instruction, the court will find reversible error only if the requested instruction "1) was a substantially correct statement of law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given [claim]." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 505 (5th Cir. 2012) (citation omitted).

### 1

■■■ Janvey first argues that the jury instructions were erroneous because they failed to define the word "intent." For the purpose of determining whether SCB's

transfers to Dillon Gage were fraudulent, the district court instructed the jury that "[a] transfer made by SCB is fraudulent if SCB made the transfer with actual intent to hinder, delay, or defraud any creditor of SCB." Janvey requested this additional instruction:

[I]f you find that SCB disregarded the substantial certainty that SCB's creditors would be hindered, delayed, or defrauded by the transfers to Dillon Gage, then the transfers were made with actual intent to hinder, delay, or defraud those creditors. SCB acted with such disregard if, at the time that it made the transfers to Dillon Gage, SCB knew that it could not pay existing creditors.

Janvey argues that "the proposed instruction would have provided a critical clarification" because the legal definition of intent is broader than the common-sense meaning of the term. Specifically, Janvey argues that the legal definition of intent, unlike the colloquial definition, includes cases in which a party "disregarded the substantial risk or certainty that a particular consequence would occur" even if the party did not desire the result.

■ As a general matter, "[t]erms which are reasonably within the common understanding of juries, and which are not technical or ambiguous, need not be defined in the trial court's charge." *United States v. Anderton*, 629 F.2d 1044, 1048–49 (5th Cir. 1980). Nonetheless, "[w]hen the instruction uses a term of legal significance, its meaning must be explained, especially when there is a request for clarifying instructions." *Id.* at 1049.

Texas's model TUFTA jury instructions do not define intent. *See* Texas Pattern Jury Instruction, Business, Consumer, Insurance & Employment § 105.25 (2016). And Texas's approach is consistent with the model jury instructions from other states that have adopted the UFTA. *See,*

*e.g.,* Alabama Pattern Jury Instructions § 18.22 (3d ed. 2015); California Model Jury Instruction § 4200 (2016); North Carolina Civil Pattern Jury Instruction § 814.50 (2015). Moreover, in federal cases when intent is an element, we too have approved jury instructions that have left the term undefined. *See, e.g., United States v. Sanchez–Sotelo*, 8 F.3d 202, 212 (5th Cir. 1993). Accordingly, we conclude that the district court did not err by declining to define intent.

■ In any event, failure to give Janvey's proposed instruction did not impair his presentation of his claim. Although the jury was instructed to consider whether SCB acted with "actual intent," the charge went on to instruct the jury that "actual intent" could be determined through consideration of, among other factors, the badges of fraud. And, the badges of fraud list objective measures of the debtor's assets, liabilities, and conduct as being probative of intent. Accordingly, under the instructions as given, the jury was told to consider not just the state of mind of SCB's principals in determining intent but also the objective facts surrounding the challenged transfers. The instructions therefore allowed Janvey to argue his "substantial-certainty" theory to the jury and signaled to the jury that they should take the theory seriously. Thus, the jury charge was not reversible error. *See Baisden*, 693 F.3d at 504–05.

2

■ Janvey next argues that "[t]he instructions also improperly increased the Receiver's burden of proof because they did not specify that the Receiver did not have to prove most or all of TUFTA's eleven badges of fraud to show SCB's fraudulent intent." Specifically, Janvey complains that by listing all eleven badges

of fraud in the jury instructions, but not instructing the jury that all eleven need not be found to find fraudulent intent, the jury could have been misled.

Contrary to Janvey's claim, the jury instruction as given communicated to the jury that not all eleven badges needed to be found. The district court instructed the jury that "[i]n determining actual intent, consideration may be given, among other factors, to" the badges of fraud. This instruction closely mirrors the Texas Pattern Instruction. *See* Texas Pattern Jury Instruction, Business, Consumer, Insurance & Employment § 105.25 (2016) ("In determining actual intent, you may consider, among other factors [the badges of fraud]."). The use of the term "may" instructed the jury that they could, but did not have to, consider any of the badges of fraud. Bryan Garner, Black's Law Dictionary 1068 (9th ed. 2009) (defining "may" as "to be permitted to"). Similarly, the use of the phrase "among other factors" instructed the jury that the badges of fraud were a nonexhaustive list. The charge therefore properly instructed the jury that they could, but were not required to, consider the badges of fraud and that they could also consider any other relevant factor.

3

■■■ Janvey next argues that the district court's instruction on debtor preferences was erroneous. The district court instructed the jury that "[a] debtor's mere intention to prefer one creditor over another does not indicate fraudulent intent, provided that the creditor does not receive more than is reasonably necessary to pay its debts." Janvey contends that the district court's instruction was "prejudicial ... because it incorrectly suggested that preferential transfers and fraudulent transfers are mutually exclusive."

The instruction, however, was a correct statement of Texas law. Under Texas law, "a debtor has the right to prefer his obligation to one creditor over an obligation to another creditor." *Englert v. Englert*, 881 S.W.2d 517, 518 (Tex. App.—Amarillo 1994, no writ); *see also Quinn v. Dupree*, 157 Tex. 441, 303 S.W.2d 769, 774 (1957) ("[E]very debtor has the right to pay or secure one or more of his just debts with any property he has, provided that no m[or]e property is transferred than is reasonably necessary to pay or secure the debt. A mere intention to prefer one creditor over the other thus will not vitiate the transaction, and the conveyance or security instrument will not be h[el]d void as to creditors unless it was executed with fraudulent intent or amounts to a fraud in law.") (alterations in original); *Jackson Law Office*, 37 S.W.3d at 25 ("The general rule is that a debtor has the right to prefer his obligation to one creditor over an obligation to another creditor."). Texas's preference law "remain[s] valid notwithstanding the subsequent enactment of the TUFTA...." *Alexander v. Holden Bus. Forms, Inc.*, No. 4:08-CV-614-Y, 2009 WL 2176582, at *7 (N.D. Tex. July 20, 2009). Accordingly, "[a] debtor in Texas has the right to prefer an obligation to one creditor over an obligation to another creditor, as long as the debtor's preference is devoid of fraudulent intent." *Geneva Corp. Fin., Inc. v. Waddell*, 251 F.3d 157, 2001 WL 300795, at *2 (5th Cir. 2001) (unpublished); *see also Janvey v. Golf Channel, Inc.*, 792 F.3d 539, 543 (5th Cir. 2015) (noting that the "right to prefer does not extend to transfers made in fraud of the rights of the other creditors" (citing *Englert*, 881 S.W.2d at 518)).

The district court instructed the jury that a debtor's "mere intention" to prefer one creditor over another creditor "does not indicate fraudulent intent." The use of the word "mere" is critical. "Mere" means

"being nothing more than." Merriam–Webster's Collegiate Dictionary 726 (10th ed. 2002). The instruction thus told the jury that a debtor's intention to prefer a specific creditor, standing alone, is not fraudulent. That is an accurate summary of Texas law. *See Englert*, 881 S.W.2d at 518 (noting that fraudulent intent must be affirmatively shown and that the debtor's mere knowledge that there were other creditors who were not receiving payment was insufficient to show fraudulent intent).

■ Janvey argues that even if the instruction was a technically correct statement of law, it was misleading "because it suggested that as long as SCB made a transfer with the intent of satisfying one of its creditors—in this case, Dillon Gage—then that transfer could never be avoidable under TUFTA." But the instruction does not suggest that a preferential transfer can never be fraudulent. Instead, it says that a "mere intention" does not "indicate" fraudulent intent. The word "mere" alerted the jury that the instruction referred to preferences standing alone, not preferences in conjunction with other indicators of fraud. Moreover, the word "indicate" told the jury that the instruction dealt with evidentiary conclusions that could be drawn from the debtor's preference. *See* Merriam–Webster's Collegiate Dictionary 590 (10th ed. 2002) (defining "indicate" as "to be a sign, symptom, or index of"). Taken together, the instruction informed the jury that a debtor's intent to prefer one creditor over another was not evidence of fraud. It did not instruct the jury that a debtor's intent to prefer one creditor insulated the debtor from fraud.

4

■ Finally, Janvey objects to the district court's definition of assets. The parties' dispute over the "assets" instruction centers on Section 24.003 of TUFTA,

which defines insolvency. Section 24.003(a) provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Tex. Bus. & Com. Code § 24.003(a). Section 24.003(d) excludes specific kinds of assets from the calculation of assets prescribed by Section 24.003(a): "[a]ssets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter." Tex. Bus. & Com. Code § 24.003(d).

The district court instructed the jury:

A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. . . . Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable.

A transfer made by the Stanford Ponzi scheme to SCB is presumed to be voidable, unless the transfer is taken in good faith and for reasonably equivalent value.

Janvey objects to the second paragraph of the instruction. He argues that the instruction was a misstatement of law because it allowed the jury to count money transferred from the Stanford Ponzi scheme to SCB as SCB's assets.

Even assuming that the district court erred in giving the instruction, which we doubt, the error was harmless. We will remand to correct a flawed jury instruction only if the error "affected the outcome of the case." *Jowers*, 617 F.3d at 352 (quoting *Bender*, 1 F.3d at 276); *see also Rubinstein v. Admins. of Tulane Educ. Fund*, 218 F.3d 392, 404 (5th Cir. 2000) ("Further,

and importantly to this case, review of jury instructions is for harmful error. Even if an instruction erroneously states the applicable law or provides insufficient guidance, this Court will not disturb the judgment unless the error could have affected the outcome of the trial.").

As Janvey himself recognizes, the issue of which of SCB's assets count as "assets" under Section 24.003(d) is only relevant to determining whether SCB's debts were greater than its assets at a fair valuation, which is one of two ways to show insolvency under TUFTA (the other being general failure to pay debts as they become due). *See* Tex. Bus. & Com. Code § 24.003. However, Janvey did not attempt to prove SCB's insolvency through a comparison of SCB's debts and assets. Janvey's expert testified that she did not attempt to value SCB's debts or assets. In fact, Janvey's expert testified that she had not even attempted to determine what SCB's assets were. The district court noted that "[o]n the issue about insolvency and debts greater than all assets at fair valuation, I agree with [Dillon Gage] that no single expert witness testified to that and that plaintiff's expert disclaimed any opinion on the definition of insolvency." Moreover, no witness gave a complete accounting of SCB's debts and assets. And we have held that balance-sheet insolvency cannot be determined when evidence of the debtor's assets is not introduced. *Lamar Haddox*, 40 F.3d at 121–22. Thus, any miscalculation of SCB's assets could not have led to a different outcome on the insolvency badge because no party has argued (even on appeal) that SCB was balance-sheet insolvent or offered evidence showing SCB's full assets and debts at a fair valuation. We conclude that any error with respect to the assets instruction was harmless.

### III

We now turn to Dillon Gage's cross-appeal concerning attorney's fees. Following trial, Dillon Gage requested an award of $278,603 in attorney's fees. The district court denied the motion, concluding that Janvey's claims "were not frivolous, unreasonable, or without foundation[,]" that the litigation represented Janvey's "most likely avenue by which he can fulfill his goal of maximizing recovery to make whole the Stanford Ponzi scheme's defrauded investors[,]" and that "an award of attorney's fees for Dillon Gage would not be equitable and just."

 This court reviews awards or denials of attorney's fees for abuse of discretion; factual findings supporting a fee award are reviewed for clear error, and legal conclusions underlying a fee award are reviewed de novo. *Dearmore v. City of Garland*, 519 F.3d 517, 520 (5th Cir. 2008). The standard of review is substantially the same under Texas law. *See Shaw v. Cty. of Dallas*, 251 S.W.3d 165, 171 (Tex. App.—Dallas 2008, pet. denied) ("We will reverse a trial court's ruling on a request for attorney's fees under [a discretionary fee statute] only if the court's decision is arbitrary, unreasonable, and without regard to guiding legal principles.").

 TUFTA provides that "the court may award costs and reasonable attorney's fees as are equitable and just." Tex. Bus. & Com. Code § 24.013. "This provision of TUFTA gives the trial court the sound discretion to award attorney's fees based on the evidence the trial court heard." *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.—Dallas 2007, no pet.). "The Court's exercise of this discretion is subject to the following limitations: any fees awarded must be reasonable and necessary, and must also be equitable and just." *Janvey v. Romero*, No. 3:11-CV-0297-N, 2015 WL 11017950, at *1 (N.D. Tex. Sept. 22, 2015) (citing *Qui Phuoc Ho*

*v. MacArthur Ranch, LLC*, No. 05-14-00741-CV, 2015 WL 5093273, at *10 (Tex. App.—Dallas Aug. 28, 2015, pet. denied)). A number of factors are relevant to determining whether a fee award is "equitable and just" under TUFTA, including: (1) whether the case involved egregious conduct, *In re Pace*, 456 B.R. 253, 283 (Bankr. W.D. Tex. 2011); (2) whether an award of fees accomplishes the goals of TUFTA, *In re Edwards*, 537 B.R. 797, 806 (Bankr. S.D. Tex. 2015); (3) the evidence heard by the trial court, *Citizens Nat. Bank of Tex. v. NXS Const., Inc.*, 387 S.W.3d 74, 87 (Tex. App.—Houston [14th Dist.] 2012, no pet.); and (4) "evidence of bad faith, vexation, wantonness, oppression, or harassment relating to the filing or the maintenance of this action[,]" *RFAR Grp., LLC v. Epiar, Inc.*, No. 11-CV-3432, 2013 WL 1743880, at *3 (N.D. Tex. Jan. 9, 2013), *report and recommendation adopted*, 3:11–CV–3432–L, 2013 WL 1748619 (N.D. Tex. Apr. 23, 2013).

Dillon Gage does not assert that the district court relied on improper considerations when it denied the fee request; instead, it contends that the district court impermissibly placed a higher burden on prevailing defendants than prevailing plaintiffs by focusing on the frivolousness of Janvey's claim here and by not focusing on the frivolousness of the defenses in other cases in which the receiver prevailed. However, nothing in the district court's order suggests that it treated Dillon Gage differently merely because it was a prevailing defendant. The closest the district court came to signaling a different standard between prevailing plaintiffs and defendants is its statement that this case "and other similar claims" represented the Receiver's best chance at maximizing his recovery. But, even that statement does not insist that all prevailing TUFTA plaintiffs must be awarded fees. Instead, read in context, the district court was saying that the goals of the receivership are best served when the receiver brings claims similar to those brought in this litigation—namely non-frivolous claims. Moreover, Dillon Gage's contention that *Romero*, 2015 WL 11017950, demonstrates unequal treatment is without merit. In *Romero*, the district court awarded fees to a prevailing receiver. *See id.* at *3–4. Dillon Gage argues that in *Romero* "the court held that it would always be 'equitable and just' to award fees to a receiver who prevailed at trial in view of a receivership's 'goals and purposes.'" But that simply is not what *Romero* says. Instead, the district court in *Romero* found that a fee award was "equitable, just, and reasonable based on the evidence" including "the case's outcome and the receivership's goals and purposes." *Id.* at *2–3. Nowhere did the district court say that prevailing receivers must always recover. *Id.* Accordingly, we hold that the district court did not apply the wrong standard in assessing Dillon Gage's fee request.

We AFFIRM the jury verdict. We AFFIRM the district court's order denying attorney's fees.